UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIE AGEE,

             Petitioner,

v.                                    CASE NO. 05-CV-70036-DT
                                    HONORABLE AVERN COHN

PAUL H. RENICO,

             Respondent.

_____/

## MEMORANDUM AND ORDER
## DENYING PETITION FOR A WRIT OF HABEAS CORPUS
## AND
## DENYING A CERTIFICATE OF APPEALABILITY

### I.  Introduction

This is a habeas corpus case under 28 U.S.C. § 2254 challenging Petitioner's state conviction for assault with intent to commit murder.  For the reasons that follow, Petitioner is not entitled to the relief he seeks.  Consequently, the petition will be denied.

### II.  Background

#### A.  The Trial Testimony

Petitioner was charged in Wayne County, Michigan with (1) first-degree murder for aiding and abetting the killing of Deshown Holmes and (2) assault with intent to commit murder in connection with the shooting of Robert Williams.  The charges arose from an altercation on Sarena Street in Detroit on August 1, 2000.

Petitioner was tried jointly with Ernest Green, his co-defendant.  Sergeant Gerald Williams testified at trial that he interviewed Petitioner on March 22, 2001.  Petitioner

informed Sergeant Williams that he and Ernest Green were present on Sarena Street when Deshown Holmes and Holmes' friend arrived by car. Holmes told Petitioner that he had to leave the area because he and his friends were making the spot "hot." Holmes held a bottle by Petitioner's neck as though he were going to hit him with it. Meanwhile Ernest Green was "tussling" with Holmes' friend. The two of them had their hands on a gun when the gun fired. Holmes' friend ran away. Petitioner also ran away, but he returned to the scene and heard another gunshot, which appeared to come from a different gun. He saw Holmes and Green fighting. Green said to him, "Grab him, Willie, grab him." Petitioner then hit Holmes one time in the face with his fist, and Holmes fell to the ground. Petitioner grabbed Green as Green started to stomp on Holmes' face. They left when they heard people coming toward them. Green later told him that he (Petitioner) probably killed Holmes when he hit Holmes because he did not get up. Petitioner denied shooting Holmes or seeing Green shoot anyone.

Mary Timmons lived at 7404 Sarena Street. She heard five or six gunshots on the evening of August 1, 2000. When she went to the door, she saw three men standing in the street between her house and the next house. A man with a gun was saying something like, "Don't be messing with my family." When the man to whom he was speaking tried to say something, the man with the gun and his companion hit the other man with their fists. The man fell to the ground. Then, the two men began kicking the man on his side.

Another neighbor, Vashti Kendrick, testified that she heard arguing and one or two gunshots on the evening of August 1, 2000. She looked out her window and saw a man staggering up Sarena Street. Two men were running behind him. Then she heard

2

a third gunshot, and the man fell. The two men behind him approached and kicked the man on his head, shoulders, and side. One of them had a gun. The man on the ground was saying, "Leave me alone."

Deshown Holmes' sister, Laura Holmes, testified that she and her family lived at 7538 Sarena Street and that she was outside on August 1, 2000, when her brother and his friend Robert arrived home. Deshown talked with her and her sister and then went across the street where Petitioner, Ernest Green, and another man were standing. Deshown asked the three men to move away from his mother's house. An argument ensued between Deshown and Petitioner about Petitioner being in front of his mother's property. Laura went over to Deshown and then saw Ernest Green come from between her house and her neighbor's house. He had a gun in his hand, and she saw sparks come from the gun, which fired twice. Deshown was standing by the curb at the time, and was shot. His friend Robert was standing in the street. Deshown ran up the street, and Ernest Green limped behind him.

Deshown did not have a weapon, and he did not hit anyone or kick anybody. He did not tell Petitioner to refrain from making his spot hot, and he was not selling "weed" out of their mother's house. Robert was not tussling with anybody over a gun, and although Deshown did have a bottle of liquor in his hand, he set that down before the argument with Petitioner.

Tiakeyasherod Holmes also heard the argument between Petitioner and Deshown. Deshown had been drinking that night, but the bottle which he initially possessed was setting on the curb across the street while he was talking with Petitioner. After the argument commenced between Petitioner and Deshown,

Tiakeyasherod grabbed Deshown and told him to "come on." Ernest Green then came from between the houses with a gun in his hand. She said, "Don't do it," but a shot rang out and everybody started running. She saw her brother flinch, as if he had been hit, but he stayed upright and ran toward Proctor Street. Petitioner, Ernest Green, and others ran after Deshown. Robert Williams disappeared. She later saw Deshown lying on the ground. He said that they had shot him and that he was dying.

Toriano Bradley testified that he was with Petitioner and Ernest Green on the night in question. The three of them were wrestling and joking when Deshown Holmes showed up. Deshown told them to "chill out" and to go down the street because they were making his block "hot." Bradley responded, "If you want it hot, we can make it hot." Petitioner and Deshown then started arguing. Deshown had a liquor bottle, but he did not hit Petitioner or Green with it, and Deshown's friend tried to be a peacemaker.

Bradley saw sparks from where Green was standing. He heard two gunshots, followed by three quick gunshots from another gun. Deshown then ran down the street, and his friend ran through a field. Petitioner, Ernest Green, and others ran down the street behind Deshown.

Later that night, Bradley saw Petitioner and Ernest Green in a field. They spent the night at his house and the next morning he helped them get out of the neighborhood. Petitioner and Green were devastated when they learned that the man had died. They said that they did not intend for the man to die. Green, however, admitted to Bradley that he had shot the man in the hip and hit the fender of Bradley's car. Green did not say who shot the other guy. He did say that they "stashed" the guns, and he asked both Bradley and his girlfriend whether they had any money. He

4

also inquired as to whether Bradley had any out-of-town relatives.

Robert Williams corroborated much of the testimony of the other eyewitnesses. Williams also claimed that a young man drove up in a car and got out of the car with a firearm shortly before the gunshots. In response to Deshown Holmes' comment that Petitioner and his friend were making the neighborhood hot, the young man who got out of the car said, "You want it hot, we'll make it hot." Then Williams heard gunshots. He saw Deshown run down the street followed by two young men. Williams was shot in the leg and in his side during the incident, but he did not see the actual gunshots, and he denied engaging in a struggle or wrestling over a gun with anyone that night.

The police found two spent casings in front of the house at 7544 Sarena Street and another casing at the intersection of Sarena and Proctor Streets. All three casings were nine millimeter casings that were fired from the same gun. Ernest Green's uncle testified that Green usually carried a nine millimeter gun.

A forensic pathologist testified that Holmes died from multiple blunt trauma to the head, which caused his brain to swell, and a single gunshot wound to the left hip, which caused profuse bleeding. Had Holmes not bled to death, he could have died from the head injury or survived the trauma to his head and ended up in a vegetative state. He had an alcohol level of .3, but he did not die from alcohol poisoning.

The trial court initially denied Petitioner's motion for a directed verdict of acquittal. On the following day, the trial court reconsidered its ruling and dismissed the second count, which charged Petitioner with assault with intent to murder Robert Williams. The trial court also reduced the first-degree murder charge in count one to second-degree murder.

Neither Petitioner, nor Ernest Green, testified or presented any witnesses. Petitioner's defense was that he was not guilty. His attorney pointed out during closing arguments that there was no evidence that Petitioner had a gun during the incident. Counsel argued that Petitioner had no motive and that he did not do anything to aid and abet Green. Counsel further argued that Petitioner could not have intended to kill Holmes because he was as surprised as anyone else when Ernest Green stepped from between the houses and started shooting. The trial court instructed Petitioner's jury on second-degree murder, assault with intent to commit murder, assault with intent to do great bodily harm less than murder, and felonious assault. On March 7, 2002, a Wayne County Circuit Court jury found Petitioner guilty of the lesser-included offense of assault with intent to commit murder, Mich. Comp. Laws § 750.83.

## B. The Sentence and Direct Appeal

The trial court sentenced Petitioner to imprisonment for ten to twenty years. Petitioner argued in an appeal of right that (1) the trial court foreclosed defense counsel's participation in voir dire, (2) there was insufficient evidence to support his conviction, (3) the trial court failed to ascertain whether he knowingly and intelligently waived his right to testify, and (4) the trial court erred by instructing the jury on a lesser-included offense. The Michigan Court of Appeals rejected these claims and affirmed Petitioner's conviction in an unpublished, per curiam opinion. See People v. Agee, No. 241429 (Mich. Ct. App. Oct. 14, 2003).

Petitioner raised the same issues in the Michigan Supreme Court and two new issues alleging that he was convicted twice for the same offense and that he was denied his right to effective assistance of trial and appellate counsel. The Michigan

6

Supreme Court denied leave to appeal because it was not persuaded to review the issues. See People v. Agee, 675 N.W.2d 591 (Mich. 2004) (table).

C.   State Collateral Review and the Habeas Petition

Petitioner filed his habeas corpus petition on January 6, 2005.  He raised the same six issues that he presented to the Michigan Supreme Court.  On June 6, 2005, the Court dismissed the double jeopardy claim and the ineffective-assistance-of-counsel claim as unexhausted.  The Court stayed the remaining four claims and closed the case for statistical purposes.  See Dkt. #4.

Petitioner then returned to the state court and filed a motion for relief from judgment, which the trial court denied.  On appeal from the trial court's decision, Petitioner alleged that trial and appellate counsel were ineffective, and that the trial court erred by misconstruing his request for an evidentiary hearing as a motion for relief from judgment.  On September 15, 2006, the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). See People v.  Agee, No. 268594 (Mich. Ct. App. Sept. 15, 2006).  On February 27, 2007, the Michigan Supreme Court denied leave to appeal for the same reason.  See People v. Agee, 727 N.W.2d 586 (Mich. 2007) (table).

Petitioner then filed a supplemental brief in this Court, and the Court re-opened his case.  The Court construes the habeas petition and Petitioner's supplemental brief to allege that:  (1) the trial court conducted an inadequate voir dire and foreclosed defense counsel's participation in voir dire; (2) there was insufficient evidence to support his conviction; (3) the trial court failed to ascertain whether he knowingly and intelligently waived his right to testify; (4) the trial court erred by instructing the jury on

7

assault with intent to commit murder; (5) he was convicted in violation of the Double Jeopardy Clause; (6) trial counsel was ineffective for failing to object to the trial court's instruction on assault with intent to commit murder, and appellate counsel was ineffective for failing to raise Petitioner's double jeopardy and ineffective-assistance-of-counsel claims in the appeal of right; (7) appellate counsel was ineffective for failing to raise each and every issue in the appeal of right; (8) trial counsel was ineffective for failing to present a defense and for failing to interview or secure Trevor Smith as a witness; and (9) the trial court erred by misconstruing Petitioner's request for an evidentiary hearing as a motion for relief from judgment under Michigan Court 6.508.

Respondent argues that Petitioner's claims lack merit or are procedurally defaulted. The Court opts to address all of Petitioner's claims on the merits. Review is <u>de novo</u> as to claims five through nine, because no state court assessed the merits of those claims. <u>Dorn v. Lafler</u>, 601 F.3d 439, __, No. 08-1594, 2010 WL 1266813, at *2 (6th Cir. Apr. 5, 2010) (citing <u>Maples v. Stegall</u>, 340 F.3d 433, 436-37 (6th Cir. 2003)).

### III. Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, habeas petitioners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

IV. Discussion

A. Voir Dire

Petitioner alleges that the trial court deprived him of a fair and impartial jury by conducting a cursory and inadequate voir dire and by foreclosing defense counsel's participation in the proceeding. Petitioner contends that the trial court's general questions, broad inquiry, and failure to allow his attorney to ask questions forced his attorney to exercise peremptory challenges with little insight into the jurors' attitudes. The Michigan Court of Appeals determined on review of this issue that the trial court did not abuse its discretion during voir dire.

Petitioner was entitled to be tried by an impartial jury and to ascertain whether any jurors were biased or held an opinion that would affect their fair determination of the issues. Connors v. United States, 158 U.S. 408, 413 (1895). That inquiry "is conducted

9

under the supervision of the court" and must "be left to its sound discretion." Id.

Nevertheless, "where there is substantial danger that jurors might consider

impermissible factors in reaching their verdict, the defendant has a constitutional right to

use voir dire to inquire into the jurors' beliefs respecting those factors." Potts v.

Georgia, 493 U.S. 876, 878 (1989) (Marshall, J., dissenting). "[V]oir dire must be at

least adequate to permit the defendant to identify unqualified jurors, or those who will

not be able to impartially follow the court's instructions." King v. Elo, 36 Fed. Appx. 805,

811 (6th Cir. 2002) (citing Morgan v. Illinois, 504 U.S.719 (1992)).

The trial court asked the prospective jurors many questions, including whether

they would hold it against Petitioner if he did not testify, whether they thought a

defendant must be guilty simply because he was charged with a crime, whether they

could acquit Petitioner if the prosecutor did not prove his case, and whether they had

any grudges against anyone or wanted to get even with defense attorneys. The trial

court dismissed several jurors who expressed an inability to serve either due to

personal circumstances or because they did not think they could render a fair and

impartial verdict. Petitioner has not suggested any specific questions that his attorney

should have asked to uncover bias in his case, and the record indicates that defense

counsel was satisfied with the jurors well before the prosecutor was finished exercising

peremptory challenges.

The voir dire proceedings were adequate to inquire into the jurors' beliefs and to

identify unqualified jurors. Furthermore, Petitioner was not entitled to inquire into every

specific prejudice he might have feared. King, 36 Fed. Appx. at 811 (citing Ristaino v.

Ross, 424 U.S. 589, 594 (1976)). Therefore, the state appellate court's conclusion that

10

the trial court did not abuse its discretion during <u>voir dire</u> was objectively reasonable, and Petitioner has no right to relief on the basis of the trial court's handling of <u>voir dire</u>.

## B.  Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence to support his conviction for assault with intent to commit murder.  He claims that the facts did not establish a specific intent to kill and that there were mitigating circumstances, namely, a mind clouded by emotional excitement, which caused him to act out of passion instead of sound judgment.

## 1.  Legal Framework

Courts must review a state court's sufficiency-of-the-evidence decision under the highly deferential standard of AEDPA.  <u>Stewart v. Wolfenbarger</u>, 595 F.3d 647, 653 (6th Cir. 2010) (citing <u>Tucker v. Palmer</u>, 541 F.3d 652, 656 (6th Cir. 2008)).  Relief may be granted only if the Michigan Court of Appeals unreasonably applied <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  <u>Id</u>.  The Supreme Court stated in <u>Jackson</u> that the critical question on review of the sufficiency of evidence supporting a criminal conviction is

> whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

<u>Jackson</u>, 443 U.S. at 319 (internal citation omitted) (emphasis in original).

Courts must apply the Jackson standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  <u>Id</u>. at 324 n.16. The elements of assault with intent to commit murder are: "(1) an assault, (2) with an

actual intent to kill, (3) which, if successful, would make the killing murder." People v. Lugo, 542 N.W.2d 921, 927 (Mich. Ct. App. 1995). "Intent may be inferred from all the facts and circumstances." Id.

The prosecutor's theory was that Petitioner aided and abetted Ernest Green in killing Deshown Holmes. In Michigan, one who aids and abets a crime may be prosecuted, tried, and upon conviction, punished as if he or she directly committed the offense. Mich. Comp. Laws § 767.39. To prevail on an aiding and abetting theory, the prosecutor must prove that (1) the defendant or some other person committed the charged crime, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended to commit the crime or knew, at the time he gave aid and encouragement, that the principal intended to commit the crime. People v. Robinson, 715 N.W.2d 44, 47-48 (Mich. 2006) (quoting People v. Moore, 679 N.W.2d 41 (Mich. 2004)).

Aiding and abetting encompasses "all forms of assistance rendered to the perpetrator of the crime" and "comprehends all words or deeds which may support, encourage or incite the commission of a crime." Stewart, 595 F.3d at 653 (quoting People v. Palmer, 220 N.W.2d 393, 396-97 (Mich. 1974)). "'[T]he amount of advice, aid or encouragement is not material if it had the effect of inducing the commission of the crime.'" Id. (quoting Palmer, 220 N.W.2d at 397).


2. Application

The Michigan Court of Appeals summarized the facts as follows:

[D]efendant was involved in a verbal altercation with the victim when the

12

codefendant fired two shots from a nine-millimeter handgun at the victim. After the codefendant fired the two shots at the victim who ran, defendant joined the codefendant in chasing the victim. The codefendant then fired a third shot at the victim. . . . Once defendant caught up with the victim and the codefendant, the codefendant yelled at defendant, "Grab him Willie, grab him." Defendant joined the codefendant in beating the victim's face and neck until he fell to the ground. While the victim was lying on the ground, defendant and the codefendant continued kicking him despite his pleas. Defendant and the codefendant only stopped kicking the victim when they heard people approaching. The victim died from a closed head injury and a single gunshot wound.

Agee, 2003 WL 22339716, at * 2.

This evidence was sufficient to establish that Petitioner assisted Ernest Green in assaulting Deshown Holmes. In fact, Petitioner concedes that the evidence indicated he hit the victim with his fists and feet. The intent to kill was satisfied by evidence that Petitioner chased Holmes after Holmes was shot and then kicked him in the head while he was lying helpless on the ground.

Petitioner claims that the circumstances were mitigated by emotional excitement. A crime is mitigated when it is committed "under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control." People v. Pouncey, 471 N.W.2d 346, 349 (Mich. 1991) (quoting Maher v. People, 10 Mich. 212, 219 (1862)). However,

"[t]he law does not excuse actors whose behavior is caused by just any . . . emotional disturbance. . . . Rather, the law asks whether the victim's provoking act aroused the defendant's emotions to such a degree that the choice to refrain from crime became difficult for the defendant. The legal doctrine reflects the philosophical distinction between emotions that only cause choice and emotions so intense that they distort the very process of choosing."

Id. at 350 (quoting Moore, Causation and the Excuses, 73 Cal. L. R. 1091, 1132

(1985)).

"In addition, the provocation must be adequate, namely, that which would cause the reasonable person to lose control." Id.

Deshown Holmes allegedly told Petitioner and Ernest Green to leave the area in front of Holmes' house because they were making the area "hot." This comment was not adequate provocation to cause a person to lose control of his emotions. Although Petitioner informed the police that Holmes threatened him with a bottle, eyewitnesses stated that Holmes put the bottle down before arguing with Petitioner.

The circumstances where mitigation could apply are absent from this case. A rational juror could have concluded from the evidence, viewed in the light most favorable to the prosecution, that Petitioner was guilty of assaulting Deshown Holmes with intent to murder him. Therefore, the state appellate court's ruling – that the evidence was sufficient to support the jury's verdict – was not contrary to, or an unreasonable application of, Jackson.

### C. Waiver of the Right to Testify

Petitioner alleges next that he is entitled to a new trial because the trial court failed to ascertain on the record whether he intelligently and knowingly waived his right to testify. Petitioner maintains that his attorney pressured him not to testify and the trial court had a duty to determine whether Petitioner's waiver was voluntary under the circumstances. The Michigan Court of Appeals found no merit in this claim because, under state law, a trial court is not required to establish an on-the-record waiver of a defendant's right to testify. Agee, Mich. Ct. App. No. 241429, at 2-3 (citing People v. Simmons, 364 N.W.2d 783 (1985)).

Defendants in criminal cases have a constitutional right to testify. <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-52 (1987). However, "[b]arring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." <u>United States v. Webber</u>, 208 F.3d 545, 551 (6th Cir. 2000). Waiver of the right to testify is a corollary to the right not to testify. <u>United States v. Yono</u>, __ F.3d __,__, No. 09-1548, slip op. at 3 (6th Cir. May 28, 2010). Because exercise of one right is a waiver of the other right, a colloquy into a defendant's decision not to testify could impede the defendant's right to testify and is not required, nor advisable. <u>See</u> <u>id</u>.

Petitioner's trial attorney informed the trial court that he had "prolonged discussions with [Petitioner] about his right to testify, and his co-equal right to remain silent." Counsel went on to say that he advised Petitioner "in no uncertain terms" that testifying was "a very bad idea" and that he should exercise his right to remain silent. Counsel concluded by stating that he did not know Petitioner's decision on the issue. The trial court responded, "Well, let's find out." Counsel for the co-defendant then changed the subject by stating that he was adopting Petitioner's motion for a directed verdict of acquittal. (Tr. Mar. 6, 2002, at 71-72.) Petitioner was never asked on the record whether he wanted to testify, although both defense attorneys subsequently stated that they would not be putting any witnesses on the stand. (<u>Id</u>. at 82.)

It is obvious from the record that defense counsel made a tactical decision not to have Petitioner testify. Under those circumstances, "the defendant's assent is

15

presumed." Webber, 208 F.3d at 551 (citing United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993)). "[W]aiver of the right to testify may be inferred from the defendant's conduct" and "is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." Id. (citing Joelson, 7 F.3d at 177.)

Petitioner did not alert the trial court that he wanted to testify, nor show any dissatisfaction with his attorney's advice not to testify. Thus, the contention that he wanted to testify and was prevented from doing so lacks merit. He has failed to overcome the presumption that he assented to the tactical decision not to testify.

### D. The Jury Instructions

Petitioner alleges that the trial court deprived him of a fair trial by instructing the jurors on the lesser-included offense of assault with intent to commit murder after the court dismissed the first-degree murder charge. Petitioner contends that the evidence did not support such an instruction. The Michigan Court of Appeals determined that Petitioner forfeited review of this claim by not objecting to the jury instructions during trial.

The question on habeas review of jury instructions is not whether an instruction was "undesirable, erroneous, or even 'universally condemned,'" but whether it "violated some right which was guaranteed to the defendant by the Fourteenth Amendment" or "infected the entire trial [such] that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

The Court has already determined that the evidence was sufficient to support Petitioner's conviction for assault with intent to commit murder. See supra, Part III.B. The evidence therefore supported the jury instruction on the offense, and Petitioner has

no right to relief on the basis of his claim about the jury instructions.

E.  Double Jeopardy

Petitioner asserts that he was convicted in violation of his right not to be twice put in jeopardy for the same offense.  The basis for this claim is the trial court's reduction of the first-degree murder charge in Count I to second-degree murder and the trial court's dismissal of Count II (assault with intent to commit murder).  The jury subsequently found Petitioner guilty in Count I of assault with intent to commit murder as a lesser-included offense of second-degree murder.  Petitioner contends that the trial court resolved the specific-intent element in both counts when it reduced the first-degree murder charge in Count I and acquitted him of the second count, which charged him with assault with intent to commit murder.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  The Clause "is enforceable against the States through the Fourteenth Amendment."  North Carolina v. Pearce, 395 U.S. 711, 717 (1969).  The guarantee not to be twice put in jeopardy "consist[s] of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense."  Id. (footnotes omitted).  Petitioner appears to be invoking the first protection, for he alleged in state court that the Double Jeopardy Clause bars further prosecution after a judgment of acquittal, whether based on a jury verdict of not guilty or on a court ruling that insufficient evidence existed to convict.  See United States v. Scott, 437 U.S. 82, 91

17

(1978) ("A judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal.").

The Supreme Court "has never held or intimated that the constitutional bar against double jeopardy circumscribes the legislative prerogative to define crimes and prescribe punishment in the context of a single prosecution." White v. Howes, 586 F.3d 1025, 1032 (6th Cir. 2009), petition for cert. filed, (U.S. Feb. 18, 2010) (No. 09-10306). And a federal habeas court "is bound by a state court's construction of that state's own statutes." Banner v. Davis, 886 F.2d 777, 780 (6th Cir. 1989).

In Michigan, "[w]here two persons are assaulted, there are two separate offenses." Lugo, 542 N.W.2d at 926 (citing People v. Winquest, 320 N.W.2d 346 (Mich. Ct. App. 1982)). Consequently, two assault convictions, based on assaults involving two different persons, do not constitute a double jeopardy violation. Id.

Petitioner was acquitted of assaulting Robert Williams when the trial court determined that there was insufficient evident to convict him of assault with intent to murder Williams. The jury subsequently found Petitioner guilty of assaulting Deshown Holmes with intent to murder him. Because there were separate assaults against two different people, Petitioner's acquittal of one count and conviction on the remaining count did not violate the Double Jeopardy Clause, and he has no right to relief.

### F. Trial Counsel

The sixth and eighth claims allege ineffective assistance of trial counsel.

### 1. Strickland v. Washington

To show a violation of the Sixth Amendment right to effective assistance of

counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" or if  "counsel's representation fell below an objective standard of reasonableness."  <u>Id</u>. at 687-88.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Id</u>. at 687.  The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id</u>. at 694.

### 2.  Application

Petitioner claims that his trial attorney should have (1) objected to the trial court's jury instruction on assault with intent to commit murder, (2) raised a defense to the charges, and (3) interviewed or produced Trevor Smith as a witness.  Defense counsel was not ineffective for failing to object to the jury instruction on assault with intent to commit murder, because the offense was offered as a lesser-included offense to second-degree murder, and the evidence supported the jury instruction.

Although defense counsel did not present any witnesses in Petitioner's defense, he was successful in getting one count dismissed and the other count reduced from first-degree murder, which carries a mandatory penalty of life imprisonment <u>without</u> the possibility of parole, to second-degree murder, which is punishable by life imprisonment

with the possibility of parole or any term of years.

Petitioner speculates that, if Trevor Smith had testified, he would have said that Petitioner was not the aggressor in the attack. One witness, however, testified that Trevor was not outside when the shooting occurred. (Tr. Mar. 5, 2002, at 134, 141.) Another witness testified that Trevor was there, but that he merely told the witness to get her brother who was arguing with somebody. (Id. at 156.)

Even if Trevor Smith had testified and the jury concluded that Petitioner was not the initial aggressor in the affray, it is clear from the evidence that the victim did not adequately provoke Petitioner into committing the charged offenses and that Petitioner did not act in self defense. Thus, trial counsel appears to have made a reasonable decision not to investigate and produce Trevor Smith. Strickland, 466 U.S. at 691. The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, __ U.S. __, __, 129 S. Ct. 1411, 1420 (2009).

G. Appellate Counsel

Petitioner alleges that his appellate attorney was ineffective for not raising all his claims in the appeal of right. An attorney need not advance every nonfrivolous claim requested by the defendant. Jones v. Barnes, 463 U.S. 745, 751 (1983). To prevail on his claim, Petitioner must show that his attorney's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. This standard applies to claims about appellate counsel as well as trial counsel. Webb v. Mitchell, 586 F.3d 383, 398 (6th Cir. 2009) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)), cert. denied, __ S. Ct. __, 2010 WL 637798 (U.S. Apr. 19, 2010) (No. 09-7207).

20

The "deficient performance" prong requires showing that appellate counsel made an objectively unreasonable decision to raise other issues instead of Petitioner's claims; in other words, Petitioner must show that his claims are clearly stronger than the issues counsel did present to the Michigan Court of Appeals. Thompson v. Warden, Belmont Corr. Inst., 598 F.3d 281, 285 (6th Cir. 2010) (quoting Webb, 586 F.3d at 399) (quoting Robbins, 528 U.S. at 288). To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his attorney's unreasonable failure to raise his claims on appeal, he would have prevailed. Id. (quoting Robbins, 528 U.S. at 285).

The claims that were not raised in the appeal of right and could have been raised then are the ones alleging ineffective assistance of trial counsel and a violation of the Double Jeopardy Clause. Because those claims lack merit, see supra, counsel's decision not to raise those issues might be considered sound appellate strategy. "[A]ppellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001). Petitioner therefore has no right to relief on the basis of his claim about appellate counsel.

## H. Trial Court Error

The ninth and final habeas claim pertains to the trial court's ruling on state collateral review of Petitioner's conviction. Petitioner alleges that the trial court misconstrued his post-conviction motion for an evidentiary hearing as a motion for relief from judgment. Habeas relief may not be granted for alleged deficiencies in a state's post-conviction procedures because such claims relate to a state civil matter, not to the custody of a defendant. Roe v. Baker, 316 F.3d 557, 571 (6th Cir. 2002) (citing

21

Kirby v. Dutton, 794 F.2d 245, 247 (6th Cir. 1986)). Consequently, Petitioner has no

right to habeas relief on the basis of his contention that the trial court misconstrued his

post-conviction motion. The claim is not a cognizable claim on federal habeas review.

Id.

V. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability ("COA")

must issue.[1] 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A COA may issue "only

if the applicant has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the

substantial showing threshold is met if the petitioner demonstrates that reasonable

jurists would find the district court's assessment of the constitutional claim debatable or

wrong. See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this

standard by demonstrating that . . . jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S.

322, 327 (2003). In applying this standard, the court may not conduct a full merits

review, but must limit its examination to a threshold inquiry into the underlying merit of

the claims. Id. at 336-37. When a district court denies a habeas claim on procedural

grounds without addressing the merits, a COA should issue if it is shown that jurists of

reason would find it debatable whether the petitioner states a valid claim of the denial of

a constitutional right, and that jurists of reason would find it debatable whether the court

---

[1]Effective December 1, 2009, the newly created Rule 11 of the Rules Governing
Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides
that "[t]he district court must issue or deny a certificate of appealability when it enters a
final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.

was correct in its procedural ruling.  See Slack, 529 U.S. at 484-85.

The Court finds that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims and that jurists of reason would not find the Court's rulings debatable.

## VI.  Conclusion

For the reasons stated above, the state appellate court's decision on Petitioner's first four claims was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  Petitioner's remaining claims lack merit.  As such, the petition is DENIED.  A COA is also DENIED.

SO ORDERED.

 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  May 28, 2010


I hereby certify that a copy of the foregoing document was mailed to Willie Agee 403377, Lakeland Correctional Facility, 141 First Street, Coldwater, MI 49036  the attorneys of record on this date, May 28, 2010, by electronic and/or ordinary mail.

 S/Julie Owens
Case Manager, (313) 234-5160